## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONFIGURE PARTNERS LLC, and CONFIGURE PARTNERS SECURITIES LLC, | ) ) ) ) |
| Plaintiffs, | ) ) Case No. 22-CV-8631 |
| v. | ) ) |
| RACI HOLDINGS LLC, and PNC CAPITAL FINANCE LLC, | ) ) ) |
| Defendants. | ) ) ) |

**COMPLAINT**

1.     This is an action for breach of contract. Plaintiffs Configure Partners LLC and Configure Partners Securities LLC (together, "Configure") agreed in writing to provide restructuring advice and services to Defendant RACI Holdings LLC in exchange for a monthly fee and 2% of the amount of RACI's debt ultimately restructured. Defendant PNC Capital Finance LLC, acting through its PNC Mezzanine Capital Division (PNC), owns and controls RACI. A PNC managing director, Robert Codol, promised that PNC would pay Configure's fee if a restructuring transaction resulted in RACI lacking sufficient cash flow to do so.

2.     On or around April 29, 2022, PNC, RACI, and RACI's senior creditors agreed to a transaction to restructure approximately $45 million of RACI's debt. No one has paid Configure's 2% fee and part of its monthly fees. Configure brings this action against RACI and PNC for breach of contract seeking $1,200,000 in damages.

## Parties

3.     Plaintiffs Configure Partners LLC and Configure Partners Securities LLC together operate a boutique investment banking firm headquartered in Atlanta, Georgia. All members of both LLCs are natural persons domiciled in Georgia.

4.     Defendant RACI Holdings LLC operates a disaster-recovery and property-restoration business headquartered in Newton, Massachusetts. RACI is majority owned and controlled by PNC. On information and belief, none of the other members of RACI are Georgia domiciliaries.

5.     Defendant PNC Capital Finance LLC is a wholly owned subsidiary of PNC Financial Services Group, Inc., a corporation formed under the laws of Delaware and headquartered in Pittsburgh, Pennsylvania.

## Jurisdiction and Venue

6.     This Court has subject-matter jurisdiction over this Action under 28 U.S.C. § 1332(a) because no member of the Plaintiff LLCs is a domiciliary of the same state as any member of the Defendant LLCs and because the amount in controversy exceeds $75,000.

7.     This Court has personal jurisdiction over the Defendants because they agreed to a New York forum-selection clause and because New York has a substantial connection to the ultimate transaction.

## PNC Approaches Configure to Restructure RACI's Debt

8.     RACI operates Rescon, a restoration and construction business (hence the portmanteau) specializing in recovery services after natural disasters. Since approximately 2019, RACI has been a portfolio company of PNC, which operates a private-equity division doing business as PNC Mezzanine Capital. At all times relevant to this case, PNC owned and controlled RACI and held a significant amount of RACI's mezzanine debt.

9.     By late 2019, RACI was struggling to service its senior debt, which was held mostly by a consortium of banks led by S&T Bank in central Pennsylvania; First Horizon Bank, in Memphis; and Webster Bank, in Stamford (together "the Banks"). In total, RACI owed about $45 million in senior debt, which was secured by a lien on substantially all of RACI's assets.

10.    On January 11, 2021, PNC approached Configure to assist in restructuring or refinancing RACI's debt.

2

11.    The negotiations leading to Configure's engagement were conducted between Robert Codol, a managing director of PNC, and Joseph Weissglass, a managing director of Configure.

12.    In July and August 2021, Codol and Weissglass had at least eight conversations by phone in which they finalized an agreement for Configure to provide services to PNC and RACI.

13.    During at least two of those calls, Weissglass explained his concern that certain transactions that Configure could facilitate would result in significant work for Configure and a desirable outcome for PNC but leave RACI without sufficient liquidity to pay Configure's fees.

14.    As Weissglass and Codol were negotiating Configure's engagement, they exchanged several draft engagement letters. In one draft sent in early August 2021, Weissglass included a clause (at paragraph 3(c)) reading "[RACI] shall use commercially reasonable efforts to cause PNC[] to agree to the terms of this Agreement, in writing, including, specifically, and without limitation, as to the payment of any Transaction Fee payable hereunder in form and substance acceptable to Configure."

15.    In response, Codol told Weissglass that PNC could not agree in writing to a contingent guarantee of Configure's fee until the substance of the ultimate transaction was known.

16.     Codol's concern was that PNC's investment committee would blanch at the prospect of providing a guarantee absent knowledge of the precise nature of the transaction in which RACI's debt was ultimately restructured.

17.     Instead, Codol told Weissglass that PNC would stand behind the fee in exchange for Configure's services if PNC consented to a transaction that left RACI without enough liquidity to pay Configure's fee.

18.     Codol did this because PNC wanted Configure's services, both for itself and for RACI. In promotional materials that Configure exchanged with RACI and PNC, Configure noted prominently that "Configure's process will be tailored to meet the goals of the Company *and PNC*." The negotiations for RACI to retain Configure were conducted exclusively between Configure and PNC. And, as will be explained in greater detail below, Configure in fact provided significant advisory services directly to PNC as consideration for PNC's agreement to pay Configure's fee.

19.     The services contemplated over the course of these conversations included both facilitating and advising on (1) a market refinancing, whereby RACI would refinance all or a portion of its existing debt, or (2) a restructuring, whereby RACI would negotiate the terms of its debt with its existing creditors.

20.     In a July 2021 email to PNC and RACI, Weissglass explained that Configure's "role in engagements like this is to source as many [financing and restructuring] . . . options as possible," including some that will settle more of the company's debt but at high future interest rates, and other that will settle less debt for lower rates.

21.     In that email, Weissglass noted that a solution "could involve incremental capital from PNC, a negotiated discount from the existing senior lenders, or some combination of the two."

### The August 10 Written Agreement

22.     On August 10, 2021, RACI and Configure entered into an engagement letter. (Exhibit A.)

23.     Under the Letter, Configure agreed to provide "investment banking and advisory services." (*Id.* ¶ 1.) These services are described in the Letter as either "Restructuring Services" or "Financing Services."

24.     The Letter defines "Restructuring" as: "[A]ny restructuring, reorganization, recapitalization, repayment or modification of all or a portion of the Company's indebtedness . . . including, without limitation, through *any . . . offer by any party* to convert, exchange, *or acquire* any outstanding Company indebtedness or any similar balance sheet restructuring involving the Company." (*Id.* ¶ 1(a) (emphases added).) The Letter defines "Financing" as: "(i) [T]he arrangement and/or placement of any *new bank* debt; or (ii) the issuance, sale, placement, exchange and/or contribution, whether in one or more public or private transactions or series of transactions, of (1) notes, bonds, debentures, and/or other debt securities of [RACI], including, without limitation, mezzanine and asset-backed securities, and/or (2) common equity, preferred equity, hybrid, and/or equity-linked securities of [RACI] including without limitation, convertible debt securities." (*Id.* ¶ 1(b) (emphasis added).)

25.     There are three potential sources of compensation for Configure under the Letter. First, Configure is owed a monthly fee of $35,000 for ten months and $50,000 for every month thereafter until the termination of the agreement. (*Id.* ¶ 3(a).) Second, Configure is owed "2.0% of any funded indebtedness" in a "Restructuring." (*Id.* ¶ 3(b)(A).) Finally, Configure is owed 2.0% of "any proceeds raised or committed" in a "Financing" but excluding "any proceeds paid or committed by PNC[] or its affiliates." (*Id.* ¶¶ 3(b)(B); 3(b)(iii).)

26.     The Letter specifically excludes certain transactions from the definitions of both "Restructuring" and "Financing." "Anything to the contrary in this Agreement notwithstanding," the letter reads, "a Transaction does not include any transaction (i) resulting from any non-consensual . . . foreclosure, enforcement of remedies, or other action or event imposed by the Company's senior secured lenders without the voluntary cooperation of the Company, or (ii) any tuck-in acquisition consummated by the Company that does not result in a change of control of the Company involving any acquisition or merger by the Company." (*Id.* ¶ 3(d).) This definition in turn references the agreement's definition of "Restructuring Services" to define "non-consensual" as "any non-consensual *foreclosure* or other *enforcement* of remedies (including the exercise of any stock powers or powers of attorney) by the Company's senior secured lenders . . . ." (*Id.* ¶ 1(a) (emphasis added).)

27.     Here, Configure, PNC, and RACI agreed to a letter with a broader definition of "Restructuring" than is typical in the market for investment-banking services. That was not an accident. RACI's financial circumstances, as explained

6

below, were such that the best result for RACI might involve PNC buying out its senior creditors, rather than convincing them to agree to modify the terms of the debt and continue the relationship. Such a transaction would—and in fact did—involve significant work by Configure, and so the Letter reflected that such a transaction would result in a fee. Further, the parties understood that one possible solution to RACI's financial trouble involved PNC buying out some of RACI's creditors: Weissglass had explained that to Codol in the July 2021 email, and the letter included PNC-provided dollars in the compensable definition of "Restructuring" accordingly.

28.     The definition of "enforcement" of remedies, though, is not so modified. That term, as used in the trade when applied to secured creditors, means an involuntary action against a debtor that results in money or property changing hands, as for example when a lender enforces a security interest on property and seizes it. This makes commercial sense because *every* restructuring is preceded by a significant threat from creditors—if creditors are not threatening to enforce remedies, there is no reason to restructure in the first place—and so only actual, non-consensual property-takings constitute "enforcement" of remedies.

29.     Finally, the agreement makes clear that it disclaims all reliance *by RACI and Configure* on promises made outside its four corners, but that it does *not* disclaim anything else, including reliance by Configure on promises made by PNC. (Agreement ¶ 13 ("This Agreement . . . sets forth the entire agreement *between the parties* . . . and supersedes all previous agreements *between the parties*. . . . This agreement is solely for the benefit *of the Company and Configure and no other person*

*. . . shall acquire or have any rights under or by virtue of this agreement.*" (emphasis added).)

### Configure Restructures RACI's Debt

30.    On August 10, 2021, RACI and Configure signed the engagement letter and Configure immediately began work. This work began with Weissglass and others on the Configure team spending two days onsite at Rescon's offices getting a sense of its business and payments needs and facilitating an analysis of the company's quality of earnings, an accounting measurement of the likely future reliability of its cash flow. As the quality-of-earnings report was being prepared, Configure discussed RACI's business with the Banks and convinced them that it would be in everyone's best interest to give RACI some time to improve its financial performance.

31.    Still, it quickly became apparent to Configure that a market refinancing of RACI's debt would not be possible: Although Configure had convinced the Bank Group that waiting for RACI's business to improve would be in everyone's interest, RACI's performance did not improve as quickly as anyone hoped, and so its cash flow could not possibly cover debt sufficient to repay its outstanding $45 million in senior debt. At the direction of PNC and RACI, then, Configure began negotiating with the Banks to restructure RACI's debt.

32.    Through late 2021 and into 2022, Configure led the restructuring efforts for RACI at the direction of PNC.

33.    Configure developed the foundational analysis of RACI's finances and business prospects and Configure represented RACI before its lenders in many update calls and in many conversations with the lenders' advisors. As is typical in

restructuring transactions, Configure worked evenings and weekends to ensure the optimal outcome for RACI and PNC. Throughout this process, Configure worked closely with PNC, including Codol on almost all correspondence regarding Configure's work and responding to many substantive questions from Codol and his team.

34.     On February 24, 2022 Weissglass spoke with Carl Marks & Co., an advisory firm representing the Banks. After that conversation, Weissglass wrote an email to PNC and RACI explaining that Carl Marks had told him that RACI was in breach of a "liquidity covenant" in its loan agreements with the Banks and that such a breach might be a "catalyst 'to be back at the table'" for RACI and the Banks to negotiate a restructuring of RACI's debt.

35.     Weissglass further explained in the February 24 email that Carl Marks "mentioned the concept of a note sale and recognized that the note sale would be at a discount." Weissglass noted that this was "[o]bviously a positive development *as it relates to [a] PNC purchase*." (Emphasis added.)

36.     On March 30, 2022, S&T Bank sent a letter to RACI. In this letter, S&T declared the full amount of its credit to RACI immediately due and payable. S&T did not, and did not threaten to, foreclose on any of RACI's property, something it had the right to do. Instead, all parties continued dialogue throughout course of April as they negotiated a consensual transaction.

37.     As PNC and the Bank Group were coalescing around a deal for PNC to acquire RACI's debt, Weissglass realized from conversation that the Company and PNC were not considering Configure's fee when calculating the cash used in the

transaction. And so, on April 13, 2022, Weissglass sent an invoice for its fee to PNC and RACI.

38.     Shortly thereafter, Codol and Rick Szekelyi, RACI's interim CEO, expressed some concern about the amount of the fee. In response, Weissglass explained the calculation of Configure's fee.

39.     Between April 13 and April 29, 2022, Configure continued to work diligently, at the direction of PNC, in pursuit of the restructuring of RACI's debt. Configure's team worked evenings and weekends in negotiations with the Company's lenders; participated in multiple calls with PNC and RACI to discuss proposals and counterproposals with the Banks; reviewed and commented on draft correspondence with the Banks; and reviewed and commented on draft purchase agreements under which PNC would buy RACI's debt.

40.     For example, on April 18, 2022, Weissglass spoke with Szekelyi, Codol, and some of Codol's partners to discuss terms by which PNC would buy RACI's senior debt from the Bank Group.

41.     During this conversation and several others, Szekelyi, PNC, and Configure worked to facilitate a transaction whereby PNC would acquire RACI's debt at a discount. After all, the alternative for RACI was likely bankruptcy. RACI accordingly consented to, and indeed cooperated in, the effort to sell its debt.

42.     On April 22, 2022, Codol had received an offer from Steve Matzus, a senior vice president at S&T Bank, to sell the Bank Group's debt to PNC. This offer

was the culmination of a process that involved negotiations with the Banks and Carl Marks, their advisor.

43.    Codol immediately forwarded this offer to Weissglass and Szekelyi and asked that they discuss it, which they did. In this offer, Matzus had written that "[p]er the inter creditor Agreement, there is a buy-out option/assignment provision relevant after a default under the senior debt that requires PNC to reimburse the . . . senior lenders all out-of-pocket expenses in the assignment including reasonable attorney's fees and costs."

44.    Codol never indicated that he thought this "buy-out option," or the events of "default" that preceded it, rendered any subsequent transaction excluded from the definitions in the engagement letter.

45.    Indeed Codol and Szekelyi later acknowledged that RACI in fact owed a fee on the specific transaction contemplated by this email, confirming that they understood it to be within the compensable definitions in the letter.

46.    Meanwhile, RACI was fully cooperating in the process. In addition to the two meetings mentioned above, Codol, Szekelyi, and Weissglass met many times in April 2022 to discuss the sale of RACI's debt. RACI provided week-by-week updates on its cashflow to facilitate this process and Szekelyi was included on much, if not all, correspondence regarding the deal.

47.    On or around April 29, 2022, PNC, RACI, and RACI's lenders executed a transaction to restructure RACI's debt. PNC agreed to buy RACI's senior debt

(which, including a revolving line of credit, totaled approximately $47 million) for approximately $12.5 million.

## RACI and PNC Refuse to Pay Configure's Fee

48.    By May 9th, Weissglass still had not heard a final proposal for Configure's payment, and so he and Codol exchanged emails and phone calls.

49.    In many of these emails, Codol acknowledged that Configure was owed a transaction fee. Instead, Codol contended that the total RACI indebtedness that Configure ultimately restructured should be offset by the dollars PNC provided in the transaction, such that the fee should be lower, but not zero.

50.    At no point did Codol contend that the transaction between PNC and the Bank Group was excluded from the definition of compensable transactions in the letter. Nor could he: the definition of "restructuring" includes "without limitation, . . . *any . . . offer by any party* to . . . *acquire* any outstanding Company indebtedness" and indeed the parties had obviously contemplated this exact result when negotiating the engagement letter, as Codol continued to concede.

51.    The parties were unable to reach an agreement, and this lawsuit follows.

## Claim for Relief

### *Count One*: Breach of Contract (Against RACI)

52.    Configure incorporates all prior paragraphs by reference here.

53.    The August 10, 2021, engagement letter signed by Configure and RACI is a valid and enforceable contract under New York law.

54.    The letter requires that RACI pay "$35,000 for ten months and $50,000 for every month thereafter until the termination of the agreement" and "2.0% of any

funded indebtedness" in a "Restructuring," which includes "*any . . . offer by any party to . . . acquire* any outstanding Company indebtedness."

55.    The April 29, 2022, transaction between PNC and the Bank Group was an offer by a party to acquire approximately $45 million of RACI's outstanding debt, resulting in a transaction fee of approximately $900,000.

56.    Monthly fees have been accruing under the agreement since August 10, 2021. They are due "until the termination of the agreement." The agreement may be "terminated at any time . . . upon written notice." The agreement has not been terminated by written notice to Configure.

57.    RACI paid approximately $320,000 monthly fees, but as of the date of this filing, $300,000 remain unpaid.

58.    RACI is, therefore, liable for expectancy damages of $1,200,000.

**Count Two: Breach of Contract (Against PNC)**

59.    Configure incorporates all prior paragraphs by reference here.

60.    During at least two phone calls in August 2021, Codol promised that PNC would pay Configure's fee if a transaction restructuring RACI's debt under the engagement letter resulted in RACI lacking sufficient cash flow to pay Configure's fee.

61.    PNC received adequate and independent consideration for this promise because Configure agreed to provide, and did provide, advice and counsel to PNC, which owned and controlled RACI at all times relevant to this Action.

62.    The April 29, 2022, transaction restructured RACI's debt within the meaning of the letter through PNC's purchase of that debt from the Bank Group.

63.    RACI has refused to pay Configure's fee, contending in correspondence that it lacks sufficient cash flow to do so.

64.    PNC has not paid Configure's fee.

65.    PNC is, therefore, liable for expectancy damages of $1,200,000, jointly and severally with RACI.

Prayer for Relief

Configure respectfully requests:

- A money judgment in the amount $1,200,000 against RACI, increasing by $50,000 on the 10th day of every month unless and until RACI terminates the Engagement Letter by written notice to Configure;
- A money judgment in the amount of $1,200,000 against RACI and PNC, jointly and severally, increasing by $50,000 on the 10th day of every month unless and until RACI terminates the Engagement Letter by written notice to Configure;
- An award of pre-judgment interest under N.Y. Civ. P. L. & R. § 5004; and
- All other relief that this Court deems just and proper.


Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
(*pro hac vice* forthcoming)
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.,

Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293